MARTIN v. MARTIN.

1. Divorce—Extreme Cruelty—Evidence.
   Defendant husband's admitted threats to take their 7-weeks-old baby away from its mother to a woman who lived out of the State constituted extreme cruelty sufficient to justify a decree of divorce, since it was of a nature to disrupt the family relationship, to promote distrust or hatred and drive wife from the home.

2. Same—Reconciliation—Extreme Cruelty.
   A reconciliation between parties to suit for divorce, while desirable, is not a matter which the courts can force, where an actual separation has taken place because of extreme cruelty of a nature tending to drive a spouse from the home.

3. Same—Remand—Division of Property—Alimony—Support of Child—Rights of Visitation and Custody.
   Suit for divorce is remanded to trial court for purpose of making determination as to division of the property, alimony, if any, and amount defendant husband should pay for the support of the child, right of visitation and custody, where decree of divorce, denied by trial court, is ordered entered for plaintiff wife by the Supreme Court.

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted April 6, 1951. (Docket No. 51, Calendar No. 44,827.) Decided May 14, 1951.

Bill by Anna Martin against Charles A. Martin for divorce on ground of extreme and repeated cruelty. Decree for defendant. Plaintiff appeals. Reversed and remanded for entry of decree for plaintiff.

References for Points in Headnotes

[1] Generally as to cruelty as ground for divorce, see 17 Am Jur, Divorce and Separation, § 48 et seq.

*John T. Meier* and *Herbert J. Pevos,* for plaintiff.

*Frank T. Hinks,* for defendant.

BUTZEL, J.   Anna Martin, plaintiff, brought this suit for divorce against Charles A. Martin, defendant, claiming extreme cruelty.   From a decree denying the divorce, the plaintiff has appealed.

The parties were married on June 16, 1940.   Plaintiff is a woman of education and refinement; defendant is an engineer with a good position.   The parties resided in Baltimore, Maryland, until 1942, when defendant moved to Detroit.   Plaintiff shortly thereafter, upon completion of 2 years of study at Johns Hopkins University, joined him in Detroit where she attended Wayne University until she graduated in June, 1945.   She became a dietitian at a Detroit hospital, and gradually improved her position.   By June of 1946, she was an instructor at the practical nurses training center in Detroit.   She earned $140 per month.   In June, she stopped working because of pregnancy.   Since the separation she has been employed as institutional manager of a very well-known nursery school where she has arranged to board the baby and will be able to be with it a good part of the time.

The parties had differences prior to the advent of the baby but not of such a serious nature as to be grounds for divorce.   The defendant was not a well man; he had several operations, from which, however, he seemed to recover sufficiently so that he lost little time from his work.   He required considerable rest and retired at 9 o'clock each night.   He insisted that the plaintiff also retire at this hour and she seems to have complied with his demands until after the baby came.

A daughter was born on March 8, 1947.   The defendant seemed totally unable to adjust to the

changes in his life caused by the arrival of the baby. From the showing in the record, it appears that the defendant was of a domineering nature. He seemed to have an exaggerated ego and insisted on the carrying out of his wishes. He refused to allow plaintiff to keep the child in their bedroom for it interfered with his rest. For the same reason, he frequently urged the plaintiff to take the baby and live with her mother in Pennsylvania. He also threatened to leave plaintiff, and stated that he would live by himself. The baby's schedule called for feedings at 10 p.m. and 2 a.m. In spite of this, the defendant insisted that plaintiff retire with him at 9. Plaintiff objected for she would have to be up within the hour for the 10. o'clock feeding, and this was a source of much complaint on the part of the defendant.

The Martins lived in an apartment house. Their neighbors on the same floor were a very high-grade couple named Williams, the husband being an engineer and the wife a trained nurse. One evening the Martins were visiting the Williams. While the men talked, the women were altering a coat that Mrs. Martin was planning to wear. Slightly after 10 o'clock, the defendant jumped up and insisted that his wife return to their apartment with him, saying that no one was going to rob him of his rest. When the women protested that only a few more stitches were needed, defendant picked up a hot clothes iron, held it near Mrs. Williams' arm and threatened to burn her if she did not give him the coat. The defendant explained the incident by saying that he "teasingly threatened to burn her with the iron," and that "there was never any ill-feeling about it." The others indicated in their testimony that they thought defendant was serious.

The serious climax to an unhappy sequence of events came on April 23, 1947, when the baby was less than 7 weeks old. At 9 o'clock plaintiff had not yet

retired when the defendant suddenly came from the bedroom in a rage and started picking up the baby's clothes and cramming them into a suitcase. He ordered plaintiff to dress the baby and told her that he was going to take the baby by plane to Colorado to a woman whom he had known there 16 years ago. Plaintiff became panic stricken, began to cry, and called Mr. Williams. Defendant told him what he intended to do, and after considerable argument, the neighbor pacified defendant for the time. Defendant then ordered plaintiff to go to bed immediately and, according to her testimony, and that of Williams, when she stopped to straighten out the room, he struck her and threw her into the bedroom. She was so thoroughly alarmed for the safety of herself and the baby that she took the baby and went to the Williams' apartment where she stayed all night. Defendant began pounding on the Williams' door. The police were summoned, but no arrest was made. The following morning plaintiff and the baby went to her brother's home. The parties have not lived together since that day.

After the plaintiff left him, the defendant seemed to regain his senses to a certain extent. He helped move the baby's paraphernalia to the plaintiff's brother's home. He gave her the bankbook to their joint banking account, not knowing that plaintiff had already withdrawn $3,800 shortly before because of her fear that she might become destitute if he left her as he had threatened. He gave her the title to a 31-foot cruiser, which he had purchased for $800, and which had been the source of much pleasure to him. Finally, he left Detroit for a short period and allowed plaintiff to return to the apartment.

We have gone over the facts preceding the separation in more detail than usual, because of their importance in reaching a decision. The husband was not a well man, and was entitled to more solicitude

than is usually required. He also had some very admirable qualities. He was not too unreasonable prior to the arrival of the child and his actions immediately after the separation were generous and helpful. However, after the baby came and until the separation, his conduct constituted extreme cruelty.

The trial judge who heard the case commented on the fact that plaintiff cared more for her education than for the peace and happiness of her home. No testimony supports such finding. He further commented upon the right and necessity of a child to have the benefit of both parents in her upbringing. There can be no disagreement with this, provided the home be reasonably happy and not disrupted. The judge also reviewed the operations that defendant had and also the fact that in late years he was burdened "with these illnesses which might have and one can almost say did, upset his physical and mental processes."

We have repeatedly held that where there have been disagreements over trivial matters, or the parties are both to blame, we will not grant a divorce. Frequently when the parties realize that they are not entitled to one then can go back and reconcile their differences. Such is not the instant case.

Defendant's admitted threats to take a 7-weeks-old baby away from its mother was extreme cruelty in its worst form. It was of a nature to disrupt the family relationship, to promote distrust or hatred, and to drive the mother from the home, as it did in the instant case. This cannot be considered as an isolated quarrel. Defendant's actions were merely the culmination of a series of events, which started when plaintiff returned from the hospital after the baby's birth.

Looking upon the married life of these parties during the period prior to the separation, as hereinbefore outlined, we believe that plaintiff is entitled to

a divorce, and much as we agree with the view of the trial judge that a reconciliation is desirable, that is a matter which the courts cannot force when things have gone as far as they have in the present case.

The case is remanded to the trial court for the purpose of entering a decree of divorce in accordance herewith and for the purpose of the determination of the division of property, alimony, if any, and the amount defendant should pay for the support of his child, as well as when defendant may visit the child or, later, have it with him, and for such other appropriate orders as may be proper in the premises. Plaintiff will recover costs.

REID, C. J., and BOYLES, NORTH, DETHMERS, CARR, BUSHNELL, and SHARPE, JJ., concurred.